UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
YNGWIE J. MALMSTEEN,                              :
                                                  :
                            Plaintiff,            :      10 Civ. 3955 (PAE)
                                                  :
              -v-                                 :
                                                  :      OPINION & ORDER
UNIVERSAL MUSIC GROUP, INC., and UMG              :
RECORDINGS, INC.,                                 :
                                                  :
                            Defendants.           :
                                                  :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

      This case arises out of a recording contract between plaintiff Yngwie J. Malmsteen, a musician, and defendant UMG Recordings, Inc. ("UMG"). Before the Court are cross-motions for summary judgment on Malmsteen's sole remaining claim in this case: a breach of contract claim against UMG and its indirect parent, Universal Music Group, Inc. (collectively with UMG, "defendants"), alleging three different violations of the agreement. Defendants move for summary judgment as to all three alleged violations. Malmsteen cross-moves for summary judgment as to two, and argues that triable issues of fact preclude summary judgment on the third. Defendants also move to dismiss the entire case as to defendant Universal Music Group, Inc. Malmsteen opposes that motion.

      For the reasons that follow, defendants' motion for summary judgment is granted in its entirety, and Malmsteen's motion is denied.

I.   **Background**[1]

   **A. The Parties and the Agreement**

Malmsteen is a professional musician. Bart Decl. Ex. 1 (Deposition of Yngwie J. Malmsteen ("Malmsteen Dep.")) at 8. Defendant UMG, a record company, is a wholly owned subsidiary of PolyGram Holdings, Inc., which in turn is a wholly owned subsidiary of defendant Universal Music Group, Inc. Harrington Decl. ¶¶ 2–3. UMG was formerly known as PolyGram Records, Inc. ("PolyGram"), having changed its name in 1999. *Id.* ¶ 2.

On November 1, 1985, PolyGram and DeNovo Productions ("DeNovo"), a division of DeNovo Music Group, Inc., entered into the recording contract at issue in this case. Bart Decl. Ex. 5 (the "Agreement"); Malmsteen Dep. 9–10.[2] Malmsteen is DeNovo's successor-in-interest under the Agreement. Bart Decl. Ex. 6. Thus, at present, the Agreement runs between Malmsteen, as DeNovo's successor-in-interest, and UMG, as the entity formerly known as PolyGram. Universal Music Group, Inc. is not a party to the Agreement.

Under its Agreement with DeNovo, PolyGram was given the exclusive right to record "Master Recordings" by Malmsteen during the term of the Agreement, and to reproduce and sell those recordings. A "Master Recording" is defined as "[a]ny recording of sound, whether or not coupled with a visual image, by any method and on any substance or material, whether now or

---

[1] The facts which form the basis of this Opinion are taken from the parties' pleadings and their submissions in support of and in opposition to the instant motions—specifically, the parties' respective Local Rule 56.1 Statements and Counterstatements of Undisputed Fact (Dkts. 78, 83, 84, 93, 96); the Declaration of Andrew H. Bart in Support of Defendants' Motion for Summary Judgment (Dkt. 79) ("Bart Decl."); the Declaration of James Harrington in Support of Defendants' Motion for Summary Judgment (Dkt. 80) ("Harrington Decl."); the Declaration of John A. Dalley in Opposition to Defendants' Motion and in Support of Plaintiff's Motion for Summary Judgment (Dkt. 85) ("Dalley Decl."); the Supplemental Declaration of Andrew H. Bart in Support of Defendants' Motion for Summary Judgment (Dkt. 94) ("Bart Supp. Decl."); and the exhibits attached to these declarations. Facts in dispute are so noted.

[2] The Agreement is governed by New York law. Agreement § 14.07.

hereafter known, intended for reproduction in the form of Phonograph Records, or otherwise, including Audio-Visual Recordings." Agreement § 13.01. The Agreement provides that such Master Recordings are "entirely the property of [UMG]" and that UMG "and its subsidiaries, affiliates, and licensees shall have the sole, exclusive and unlimited right . . . to manufacture Records . . . embodying . . . the performances embodied on Master Recordings." Agreement § 5.01. The Agreement also gives UMG the "exclusive right to publicly perform and otherwise utilize [Malmsteen's] performances in connection with Audio-Visual Recordings for promotional and commercial purposes." *Id.* § 5.02(a)(i). Under the Agreement, UMG is obliged to pay Malmsteen royalties on income derived from its exploitation of Master Recordings; the means of calculating these royalties are set forth in Article 7.

UMG is required to provide Malmsteen with semiannual royalty accountings "on or before September 30th for the period ending the preceding June 30th, and on or before March 31st for the period ending the preceding December 31st." Agreement § 8.01. The Agreement also contains a limitations provision, *see id.* § 8.05(a), which, as this Court found in a previous decision, bars Malmsteen from asserting any claims based on royalty statements rendered before the March 31, 2006 statement. *See Malmsteen v. Universal Music Grp., Inc. ("Malmsteen I")*, No. 10 Civ. 3955 (PAE), 2012 WL 2159281, at *6–8 (S.D.N.Y. June 14, 2012).

On April 3, 1989, UMG and Malmsteen executed an amendment to the Agreement. Bart Decl. Ex. 6 ("1989 Amendment"). Relevant here, the 1989 Amendment addresses a video recording of a February 1989 concert performance by Malmsteen in the Soviet Union (the "Concert Video"). *Id.* That amendment grants UMG the right to "exploit, or refrain from exploiting, the Concert Video as it deems appropriate in its sole discretion including . . . editing

3

the Concert Video . . . and manufacturing and exploiting . . . CD/Videos embodying the Concert Video or any portion thereof." *Id.* § 8(b).

The "Term" of the Agreement expired in the early 1990s, after Malmsteen had delivered four Master Recordings to UMG. Malmsteen Dep. 57–58; *see* Agreement § 1.01 (providing that the Term of the Agreement ends eight months after Malmsteen fulfills his recording obligations). Some of UMG's obligations under the Agreement were explicitly tied to the duration of the Agreement's Term, and therefore expired at this point. However, UMG's obligation to account to Malmsteen for royalties remains ongoing.

Malmsteen argues that UMG breached the Agreement in three distinct ways, each related to the calculation and payment of royalties owed to him. The Court reviews the facts relevant to each of these theories, in turn.

### B. The Royalty Rate on Sales of Digital Downloads

UMG sells Records in a variety of formats, including digital downloads sold through non-affiliated third-party retailers such as Apple's iTunes Music Store. *See* Dalley Decl. Exs. D, E. In 1985, however, when the Agreement was executed, these modern means of distribution did not exist. The Agreement accordingly contains no express provision regarding sales of digital downloads.

UMG has been crediting Malmsteen for royalties on sales of digital downloads at the rates applicable, under the Agreement, to the sale of "Records" and "Phonograph Records" through "Normal Retail Channels." "Records" and "Phonograph Records" are defined as:

> Any device now or hereafter known, on or by which sound may be recorded and reproduced, which is manufactured or distributed primarily for home and/or consumer and/or juke box use and/or use on or in means of transportation including "sight and sound" devices or Audio-Visual Devices.

*Id.* § 13.02.³  "Normal Retail Channels," in turn, are defined as "[n]ormal retail distribution channels, excluding sales of Records described in [§§ 7.05–7.08], herein."  *Id.* § 13.16.  The royalty rate applicable to such sales ranges from 8% to 15%, depending on the location of the sale, the total number of albums sold, and whether the Record sold is an "Album" or a "Single."  Agreement §§ 7.01–7.03.⁴

Different royalty rates apply to the sale of Records through certain specified methods of distribution outside of the "Normal Retail Channels."  Relevant here, under § 7.06, Malmsteen is entitled to a 50% royalty on Records sold by such methods, which include:

> licenses of Master Recordings to Non-Affiliated Third Parties for sales of Records by such licenses through direct mail, mail order, or in conjunction with TV advertising, including through methods of distribution such as "key outlet marketing" (distribution through retail fulfillment centers in conjunction with special advertisements on radio or television), or by any combination of the methods set forth above or other methods.

Agreement § 7.06(a)(ii).  In this lawsuit, Malmsteen argues that § 7.06(a)(ii), and not the provisions governing the sale of "Records" and "Phonograph Records" through "Normal Retail Channels," governs the sale of digital downloads, and therefore that UMG has breached the Agreement by calculating royalties at the lower rates provided for under §§ 7.01–7.03.

---

³ With one exception:  For reasons that the record leaves unclear, UMG has been crediting Malmsteen at the *higher* rate applicable to sales of Albums, even when customers download only Singles.  Bart Decl. Ex. 3 (Deposition of James Harrington ("Harrington Dep.")) at 57–58.

⁴ "Album" is defined as "[a] 12 inch, long-play Phonograph Record or the equivalent thereof embodying thereon the equivalent of not fewer than eight (8) Sides, and having not less than thirty-five (35) minutes playing time."  Agreement § 13.04(c) & (d).  A "Single" is defined as "[a] 7 inch, 45 rpm Phonograph Record or equivalent embodying thereon at least one (1) Side."  *Id.* § 13.04(a).  The 1989 Amendment clarified that, as used in these definitions, the phrase "or equivalent" means "every form of pre-recorded tape, compact disc or any other Record equivalent."  1989 Amendment § 10.

### C. Recoupment of Video Production Costs

UMG maintains two separate accounts for Malmsteen's royalties, one for income derived from exploitation of his audio recordings ("Audio Account") and one for income derived from exploitation of his video recordings ("Video Account"). Harrington Decl. ¶¶ 5–6. The royalties from these accounts are not payable to Malmsteen, however, "until such time as all Advances . . . have been repaid to [UMG]." Agreement § 7. An "Advance" is defined as "a prepayment of royalties and shall be charged against and shall be recoupable from all royalties accruing hereunder." *Id.* § 13.11. Included among these Advances are 50% of UMG's video production costs for a defined number of Audio-Visual Recordings. *Id.* § 6.03. UMG is similarly entitled to recoup 50% of the production costs of the Concert Video. 1989 Amendment § 8(c). Accordingly, UMG is entitled to recoup from Malmsteen's audio royalties 50% of the expenses it incurred in producing Malmsteen's video recordings, including the Concert Video, in the late 1980s and early 1990s. The parties do not dispute UMG's entitlement to recoup such expenses. Rather, they dispute whether UMG has in fact limited its calculation of recoupment to 50% of video production costs. Malmsteen claims that UMG has applied a higher percentage of its expenses against his royalties.

As audio royalties accrue to Malmsteen, UMG transfers that money from the Audio Account to the Video Account, as reflected in the royalty statements. Harrington Decl. ¶ 6. Those transfers are stated in absolute dollar figures, however, so they do not reflect what percentage of the costs has been recouped. *See id.* Ex. 1; Harrington Dep. 23–24. The royalty statements in the summary judgment record, which date back to 1988, each report a negative balance for Malmsteen's Video Account. Harrington Decl. ¶ 5 & Ex. 1. As of June 30, 2012, the negative balance in the Video Account was $119,123.31. *Id.* Ex. 1. In other words, these

6

records reflect that UMG has not yet recouped 50% of the video production costs it incurred in the late 1980s and early 1990s. *See* Harrington Decl. ¶ 7. Malmsteen, by contrast, alleges that these account statements are inaccurate: He alleges that the negative balance on these account statements reflects an attempt by UMG to recoup an excessive percentage, perhaps even 100%, of the video production costs. Malmsteen admits that he is unaware of any proof that UMG has recouped more than 50% of its costs. *See* Malmsteen Dep. 128. He does note a curious feature of the June 30, 2005 statement, which reflects that UMG paid him, that month, $5,212.53. *See* Dalley Decl. Ex. G.

### D. The *Far Beyond the Sun* DVD

In 2006, Universal Music Group International, Ltd. ("UMGI") released a DVD entitled *Far Beyond the Sun* ("the DVD"). Bart Decl. Ex. 2 (Deposition of April Malmsteen) at 54; *id.* Ex. 7. UMG did not create, manufacture, or sell the DVD (nor did Universal Music Group, Inc.). Harrington Decl. ¶ 8.

The DVD consists of video recordings of Malmsteen, some, but not all, of which are UMG's property. As noted, UMG has the exclusive right to exploit these recordings under the Agreement. *See* Agreement § 5.02(a)(i); 1989 Amendment § 8(b). Nevertheless, UMG has not received any royalties or income from exploitation of the DVD, Harrington Decl. ¶ 8, and therefore, under the terms of the Agreement, it has not paid Malmsteen any such royalties. *See* Agreement § 8.02 (providing that "royalties on Phonograph Records sold outside the United States shall not be due and payable by [UMG] until payment therefore has been received by or credited to [UMG] in the United States").

### E. Procedural History

On May 12, 2010, Malmsteen filed his original Complaint, bringing a host of claims against UMG, Universal Music Group, Inc., and Universal Music Canada, Inc ("UMG Canada"). Dkt. 1. On November 8, 2010, Malmsteen voluntarily dismissed many of these claims. Dkt. 12. On September 30, 2011, the case was reassigned to this Court. Dkt. 17. On November 22, 2011, Malmsteen filed a motion for leave to amend the complaint, Dkt. 24, which defendants did not oppose, and the Court granted, Dkt. 29.

On January 6, 2012, Malmsteen filed the Amended Complaint, asserting one breach of contract claim against the same three defendants named in the original Complaint, and a second breach of contract claim against UMGI. Dkt. 31. On April 11, 2012, all four defendants moved to dismiss the Amended Complaint in part. Dkt. 38. On June 14, 2012, after briefing and argument, the Court granted defendants' motion. The Court held that (1) it lacked personal jurisdiction over UMG Canada and UMGI, *see Malmsteen I*, 2012 WL 2159281, at *2–6 & n.1; and (2) Malmsteen's claims relating to royalty statements rendered before March 31, 2006 are time-barred, *see id.* at *6–8.

On January 25, 2013, the remaining defendants—UMG and Universal Music Group, Inc.—filed the instant motion for summary judgment. Dkts. 76–80. On February 8, 2013, Malmsteen filed his opposition to that motion and a cross-motion for summary judgment. Dkts. 82–86. On February 22, 2013, defendants filed an opposition to Malmsteen's cross-motion and reply in further support of their motion. Dkts. 92–96. On March 8, 2013, Malmsteen filed a reply in further support of his cross-motion. Dkt. 98. On April 11, 2013, the Court heard argument.

## II. Applicable Legal Standards

### A. Summary Judgment

Summary judgment may be granted only where the submissions, taken together, "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts "in the light most favorable" to the non-movant. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008). To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," because "conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### B. Breach of Contract

"Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011). Here, there is no dispute about the existence of an agreement. Rather, the parties' disputes turn on (1) the interpretation of

9

provisions of the Agreement and (2) factual questions whether defendants have breached its terms.

As to the questions of interpretation, "[t]he primary objective of a court in interpreting a contract is to give effect to the intent of the parties as revealed by the language of their agreement." *Compagnie Financiere CIC L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2d Cir. 2000). "Summary judgment is generally proper in a contract dispute only if the language of the contract is wholly unambiguous." *Id.* at 157. "The question of whether the language of a contract is ambiguous is a question of law to be decided by the Court." *Id.* at 158. Ambiguity is "defined in terms of whether a reasonably intelligent person viewing the contract objectively could interpret the language in more than one way." *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008); *see Sayers v. Rochester Tel. Corp. Supplemental Mgm't Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) ("Contract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." (citation omitted)).

To give effect to the intent of the parties, a court must interpret a contract by considering all of its provisions, and "words and phrases . . . should be given their plain meaning." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005). "A written agreement that is clear, complete and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties." *In re Coudert Bros.*, 487 B.R. 375, 389 (S.D.N.Y. 2013) (quoting *Acumen Re Mgmt. Corp. v. Gen. Sec. Nat'l Ins. Co.*, No. 09 Civ. 1796 (GBD), 2012 WL 3890128, at *5 (S.D.N.Y. Sept. 7,

2012)).  At the summary judgment stage, "[t]he mere assertion of an ambiguity does not suffice to make an issue of fact."  *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir. 1990); *see also Sayers*, 7 F.3d at 1095 ("Parties to a contract may not create an ambiguity merely by urging conflicting interpretations of their agreement.").  "Thus, the court should not find the contract ambiguous where the interpretation urged by one party would 'strain [] the contract language beyond its reasonable and ordinary meaning.'"  *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) (quoting *Bethelem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 459 (N.Y. 1957)).  "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation, unless each is a 'reasonable' interpretation."  *Id.* (internal citation and quotations omitted).

Generally, summary judgment is appropriate in a contract dispute only where the contract's terms are unambiguous, whereas "interpretation of ambiguous contract language is a question of fact to be resolved by the factfinder."  *Compagnie Financiere*, 232 F.3d at 158.  However, summary judgment is also appropriate "when the [contract] language is ambiguous and there is relevant extrinsic evidence, but the extrinsic evidence creates no genuine issue of material fact and permits interpretation of the agreement as a matter of law."  *Nycal Corp. v. Inoco PLC*, 988 F. Supp. 296, 299 (S.D.N.Y. 1997) (Kaplan, J.); *see also 3Com Corp. v. Banco do Brasil, S.A.*, 171 F.3d 739, 746–47 (2d Cir. 1999) ("[T]he court may resolve ambiguity in contract language as a matter of law if the evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide the contrary.").  "Similarly, if there is *no* extrinsic evidence bearing on the parties' intentions, the proper interpretation of ambiguous contract language is an issue for the court."  *In re Coudert Bros.*, 487 B.R. at 390 (emphasis in original) (citing *Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 116

11

(2d Cir. 1994); *Williams & Sons Erectors, Inc. v. S.C. Steel Corp.*, 983 F.2d 1176, 1184 (2d Cir. 1993)).

## III.  Discussion

Malmsteen argues that defendants breached the Agreement by: (1) failing to pay the proper royalty rate for sales of digital downloads; (2) deducting improper video production costs from audio royalties; and (3) failing to account for royalties on sales of the *Far Beyond the Sun* DVD.  Defendants move for summary judgment on all three theories.  Malmsteen cross-moves for summary judgment on the first and third theories.  The Court addresses these issues in turn.  Finally, the Court addresses defendants' argument that Universal Music Group, Inc. should be dismissed from the case whether or not the case goes forward against UMG.

### A.  The Royalty Rate on Sales of Digital Downloads

The parties' first dispute involves a pure question of contract interpretation: which royalty provision applies to sales of digital downloads?  Both parties argue that the contract is unambiguous.  Both agree that this issue is to be resolved on the face of the contract, without resort to extrinsic evidence, and may therefore be resolved as a matter of law.  *See* Transcript of April 11, 2013 Oral Argument ("Tr.") 23, 28.

As a threshold matter, digital downloads are clearly Records, as defined in § 13.02 of the Agreement.  The phrase "[a]ny device now or hereafter known on or by which sound may be recorded and reproduced" manifests the clear intent of the contracting parties that the definition of Record encompass as-yet-undeveloped technologies.  *See Reinhardt v. Wal-Mart Stores, Inc.*, 547 F. Supp. 2d 346, 354–55 (S.D.N.Y. 2008) ("The phrase 'now or hereafter known,' when referring to forms of reproduction, reveals that future technologies are covered by the agreement. . . . It is not reasonable to construe the phrase 'all forms' 'now or hereafter known' to

12

exclude Defendants' alleged digital download form."); *see also Greenfield v. Philles Records*, 98 N.Y.2d 562, 572 (2002); *Silvester v. Time Warner, Inc.*, 763 N.Y.S.2d 912, 917 (N.Y. Sup. Ct. 2003), *aff'd*, 787 N.Y.S.2d 870 (1st Dep't 2005). This broad definition evinces a practical recognition of the constantly evolving nature of music recording technology.

This leaves the question whether digital downloads are Records sold through "Normal Retail Channels," or rather by one of the specific means of distribution enumerated in § 7.06(a)(ii). UMG persuasively argues that the royalty rates set forth in §§ 7.01–7.03 apply here. In today's market, the phrase "Normal Retail Channels" comfortably encompasses digital downloads sold through Apple's iTunes store and similar platforms—brick-and-mortar record shops have gone the way of the 8-track, the phonograph, and the mastodon. *See Allman v. Sony BMG Music Entnm't*, No. 06 Civ. 3252 (GBD), 2008 WL 2477465, at *2 (S.D.N.Y. June 18, 2008), *judgment vacated with leave to amend pleadings*, No. 06 Civ. 3252 (Dkt. 37). Applying the 8–15% royalty rate contained in §§ 7.01–7.03 to retail sales of digital downloads, rather than the 50% rate contained in § 7.06(a)(ii), also accords with the structure of the Agreement: For sales to consumers through normal retail channels that are reliably and readily measured, the contract provides for a lower rate; by contrast, as to the unique and, at least potentially, less traceable methods of distribution to consumers listed in § 7.06(a)(ii), the artist, Malmsteen, is assigned a higher rate of compensation. *See generally* Tr. 7–13. Because "Records" are defined broadly enough to include digital downloads, and because the sales of these downloads through media like the iTunes store are the normal retail channels in today's music industry, §§ 7.01–7.03 unambiguously govern the applicable royalty rates here.

Malmsteen argues that the 50% royalty rate set forth in § 7.06(a)(ii) applies. That provision, however, does not fit. Section 7.06(a)(ii) covers "licenses of Master Recordings to

Non-Affiliated Third Parties for sales of Records" by the following specifically enumerated means of distribution: "direct mail, mail order, or in conjunction with TV advertising, including through methods of distribution such as 'key outlet marketing' (distribution through retail fulfillment centers in conjunction with special advertisements on radio or television)." Agreement § 7.06(a)(ii).  The sale of digital downloads does not resemble any of these methods.  Recognizing this, Malmsteen argues that digital downloads are nonetheless picked up by the residual clause following this list: "or by any combination of the methods set forth above *or other methods*." *Id.* (emphasis added).  In Malmsteen's view, the phrase "or other methods" has essentially no limit.  Tr. 34 ("Q:  So is there any limitation, in your words, to the expression[] 'or other methods' . . . ; is it limited in any way by the more specific items identified in the earlier part of that clause?  A:  I do not believe so, your Honor.").

Malmsteen's reading of the Agreement is undermined by two basic principles of contractual interpretation.  First, under the principle of *ejusdem generis*, when a general phrase, such as "or other methods," follows a list of specific terms, the general phrase must be interpreted to refer to items of the same ilk as those specifically listed.  *See Travelers' Ins. Co. of Hartford v. Seaver*, 86 U.S. 531, 538 (1873); *Haynes v. Kleinewefers & Lembo Corp.*, 921 F.2d 453, 457 (2d Cir. 1990); *Purchase Partners, LLP v. Carver Fed. Sav. Bank*, No. 09 Civ. 9687 (JMF), 2012 WL 6641633, at *8 (S.D.N.Y. Dec. 13, 2012) (citing Black's Law Dictionary 594 (9th ed. 2009)).  Here, however, digital downloads are unlike the specific means of distribution enumerated in § 7.06(a)(ii).  Second, as Malmsteen notes, *see* Pl. Reply Br. 3, an interpretation rendering contractual provisions redundant or superfluous is disfavored.  *See Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002); *Serdarevic v. Centrix Homes, LLC*, 760 F. Supp. 2d 322, 332 (S.D.N.Y. 2010).  Here, interpreting "or other methods"

as Malmsteen does—to be essentially limitless—would render superfluous both the specifically enumerated list in that section and the separate sub-section addressing the sale of Records through record clubs.  *See* Agreement § 7.06(a)(iii).

For these reasons, Malmsteen's reading of the Agreement is unpersuasive:  Section 7.06(a)(ii) cannot reasonably be interpreted to cover sales of digital downloads.[5]  Accordingly, UMG was correct to apply the royalty rates set forth in §§ 7.01–7.03 to the sale of digital downloads, and summary judgment is merited in UMG's favor on this claim.

### B. Recoupment of Video Production Costs

The parties do not dispute that, under the Agreement, UMG is entitled to recoup 50% of the expenses it incurred in producing certain of Malmsteen's videos in the late 1980s and early 1990s.  *See* Agreement § 6.03; 1989 Amendment § 8(c).  Their only dispute is a factual one— whether UMG has in fact applied more than 50% of those expenses against the royalties due to Malmsteen.

The operative document used by UMG to track the sums due to Malmsteen is a biannual royalty accounting statement that it furnishes to Malmsteen.  As noted, those accounting

---

[5] *FBT Productions, LLC v. Aftermath Records*, 621 F.3d 958 (9th Cir. 2010) is not to the contrary.  The agreement at issue in that case contained two distinct royalty provisions:  (1) the "Records Sold" provision, which applied to "full price records sold . . . through normal retail channels"; and (2) the "Masters Licensed" provision, which applied to "masters licensed . . . to others for their manufacture and sale of records or for any other uses."  *Id.* at 961.  The court found that the higher royalty rate of the Masters Licensed provision applied, because the agreement provided that "notwithstanding" the fact that a sale arguably falls within the scope of the Records Sold provision, the Masters Licensed provision would apply to masters "that are licensed to third parties for the manufacture of records 'or for any other uses.'" *Id.* at 964.  That "admittedly broad" language in the Masters Licensed provision, *id.*, is a far cry from the narrow list of uses enumerated in § 7.06(a)(ii).  Because the applicable royalty provisions in the Agreement do not turn on the distinction between "sales" and "licenses," as they did in *FBT*, the Court need not decide here whether UMG sells or licenses master recordings to Apple and other third-party retailers.  Even assuming that this were a licensing relationship, it is not of the sort contemplated by § 7.06(a)(ii), and therefore is covered by the broader scope of §§ 7.01–7.03.

statements have consistently shown a negative balance: in other words, that the royalties due to Malmsteen have yet to eclipse the video production costs incurred by UMG that it has applied against those royalties. *See* Harrington Decl. Ex. 1. The oldest of these statements, covering the period ending December 31, 1988, reflects a negative balance of $215,868.50. *Id.* On subsequent statements, this negative balance grows to a peak of $624,942.60 in 1990, which corresponds to the time frame during which the parties represent that UMG was incurring costs to produce Malmsteen's videos. *Id.* Since 1990, the negative balance has gradually decreased as Malmsteen's audio royalties have been transferred into his video account and applied against the negative balance that was carried forward. *See* Harrington Decl. ¶ 6. As of June 30, 2012, the negative balance stood at $119,123.31. *Id.* Ex. 1.

Malmsteen claims that this negative balance must reflect that UMG, back in the late 1980s through 1990, was improperly deducting 100% of its video production costs from his audio royalties, rather than 50% as required. However, the time to make such a claim lapsed long ago. This Court has already ruled that Malmsteen's claims are barred insofar as they are based on any royalty statements rendered before March 31, 2006, *see Malmsteen I*, 2012 WL 2159281, at *6–8, and the deductions that Malmsteen challenges here were taken, and reflected, on royalty statements rendered in the late 1980s and early 1990s, *see* Harrington Decl. Ex. 1. No statement rendered on March 31, 2006 or thereafter reflects any new deductions made against Malmsteen's balance. Rather, the negative balance has been creeping steadily towards zero. *See id.* If Malmsteen believed that the deductions taken more than 20 years ago from his account were excessive and represented more than the 50% that UMG was entitled to take, he should have challenged those entries after he received the account statements reflecting them. Instead, he slept on his rights for two decades. Malmsteen cannot now defeat the parties' contractual

limitations provision by asserting a claim based on the negative balance carried forward from an allegedly improper deduction taken more than 15 years outside the limitations period. For this reason, summary judgment is merited in UMG's favor.[6]

### C. The *Far Beyond the Sun* DVD

In the Amended Complaint, Malmsteen alleges that UMG and UMGI breached the Agreement by distributing the DVD without Malmsteen's consent. Am. Compl. ¶¶ 41–42, 47–48, 52. UMGI has since been dismissed from this case for lack of personal jurisdiction. *See Malmsteen I*, 2012 WL 2159281, at *2–6. As for UMG, as it points out in its brief, *see* Def. Br. 18, the provision requiring it to secure Malmsteen's consent before exploiting certain audio-visual recordings is explicitly tied to the Term of the Agreement, *see* Agreement § 5.02(b), which expired in the early 1990s, *see* Malmsteen Dep. 57–58; Agreement § 1.01. Not surprisingly, Malmsteen has ceased to pursue this theory of breach.

---

[6] That the parties today cannot reconstruct with certainty the formula UMG used long ago to calculate this deduction is not surprising: During discovery, UMG objected to Malmsteen's request that such information be produced, and the Court sustained that objection. *See* Dkt. 74. Not only would such discovery have related to long-time-barred royalty statements, but it would have required UMG to conduct an extensive audit of production and other expenses incurred over two decades ago. The difficulties inherent in such an inquiry—such as finding an employee at UMG who could authenticate royalty statements from the 1980s—are why contractual limitations provisions like the one at issue here are put in place. UMG has offered that it is the contemporary understanding of James Harrington, the Vice President of Royalties & Copyright at UMG, that the negative balance reflects only 50% of video production costs. *See* Harrington Decl. ¶ 7. Malmsteen admits of no knowledge to the contrary, *see* Malmsteen Dep. 128, and, as noted, he failed to object to the deductions when the royalty statements bearing them were rendered to him two decades ago. Malmsteen's only support for his claim that UMG applied excess deductions is that a one-time payment of $5,212.53 to Malmsteen's Audio Account is reflected on the June 30, 2005 royalty statement. *See* Dalley Decl. Ex. G. But this payment, whatever the circumstances that brought it about, has no discernible relationship to the percentage of costs deducted from Malmsteen's Video Account 15 years earlier. To overcome a summary judgment motion, "[a] party may not rely on mere speculation or conjecture." *Hicks*, 593 F.3d at 166. Yet that is what Malmsteen does here.

Instead, Malmsteen argues that UMG's failure to account for royalties on sales of the DVD by UMGI is another instance of miscalculation of royalties.  However, it is undisputed that:  (1) UMGI, not UMG, sold the DVD, Bart Decl. Ex 7; Harrington Decl. ¶ 8; (2) UMG has not received any payment from UMGI for the DVD's exploitation, Harrington Decl. ¶ 8; and (3) under the terms of the Agreement, UMG need not pay royalties to Malmsteen until UMG receives such payment, Agreement § 8.02.  Accordingly, no royalties are currently owed to Malmsteen.

Malmsteen makes a final effort to avoid summary judgment by asserting that "[i]f not explicitly, [UMG] has at a minimum implicitly licensing [*sic*] the [concert footage] to its foreign affiliate [UMGI].  [UMG]'s failure to account to Malmsteen or even try to obtain revenue from [UMGI] for the exploitation and sale of [the DVD], . . . constitutes a breach of the implied covenant of good faith that is part of every contract made under New York law."  Pl. Br. 9–10.  That allegation, however, is nowhere to be found in the Amended Complaint, and "[a]n opposition brief is not the place to raise new allegations."  *Perkins v. Am. Transit Ins. Co.*, No. 10 Civ. 5655 (CM), 2013 WL 174426, at *21 (S.D.N.Y. Jan. 15, 2013) (citing *Lyman v. CSX Transp., Inc.*, 364 F. App'x 699, 701 (2d Cir. 2010) (summary order)).  Because Malmsteen failed to include this claim in his Amended Complaint,[7] instead raising it for the first time in opposition to summary judgment, it is waived.  *See Rojo v. Deutsche Bank*, 487 F. App'x 586, 588–89 (2d Cir. 2012) (summary order) (argument that defendant violated duty of good faith and fair dealing waived where first raised in opposition to summary judgment); *Compania Embotelladora del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 324 (S.D.N.Y. 2009) (same); *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 170 F.R.D. 111, 119 (S.D.N.Y. 1997)

---

[7] Malmsteen's attempt to argue that this claim was somehow implicitly included in his Amended Complaint is unpersuasive.  *See* Pl. Reply Br. 6 (citing Am. Compl. ¶¶ 41–43, 47–50).

18

(same); *see also Augienello v. Coast-to-Coast Fin. Corp.*, 64 F. App'x 820, 822 (2d Cir. 2003) (summary order) (affirming dismissal of breach of contract claim where complaint makes no mention of a duty of good faith and fair dealing).  UMG's motion for summary judgment is therefore granted on this claim, and Malmsteen's cross-motion is denied.

### D.  Universal Music Group, Inc.

Even assuming that Malmsteen's claims could survive as to UMG, summary judgment must still be granted in favor of Universal Music Group, Inc., because it was not a signatory to the Agreement.  "A contract cannot bind a non-party unless the contract was signed by the party's agent, the contract was assigned to the party, or the signatory is in fact the 'alter ego' of the party."  *Wolfson v. Conolog Corp.*, No. 08 Civ. 3790 (LTS)(MHD), 2009 WL 465621, at *3 (S.D.N.Y. Feb. 25, 2009) (citation omitted)).  "An exception to this rule exists, however, where a non-party 'manifests an intent to be bound by the contract.'"  *Travelers Cas. & Sur. Co. v. Dormitory Authority-State of N.Y.*, 735 F. Supp. 2d 42, 80 (S.D.N.Y. 2010) (quoting *Horsehead Indus., Inc. v. Metallgesellschaft AG*, 657 N.Y.S.2d 632, 633 (1st Dep't 1997)).  Thus, a non-signatory parent corporation, such as Universal Music Group, Inc., could be held liable if its intent to be bound by the contract were "inferable from the parent's participation in the negotiation of the contract, or if the subsidiary is a dummy for the parent, or if the subsidiary is controlled by the parent for the parent's own purposes."  *MBIA Ins. Corp. v. Royal Bank of Can.*, 706 F. Supp. 2d 380, 396 (S.D.N.Y. 2009) (quoting *Horsehead Indus.*, 657 N.Y.S.2d at 633).

Malmsteen has adduced no evidence that such circumstances exist here.  Rather, Malmsteen's sole basis for asserting that Universal Music Group, Inc. is bound by the Agreement is the claim that "no officer for either Universal defendant has given a clear explanation as to the relationship between the parties."  Pl. Br. 16.  But that is not so.

Defendants have provided evidence that Universal Music Group, Inc. is an indirect corporate parent of UMG, and that Vivendi S.A. is the ultimate corporate parent of each. Harrington Decl. ¶¶ 2–3. Malmsteen, in response, has offered no evidence that Universal Music Group, Inc. participated in the negotiation of the contract or controlled UMG for its own purposes. James Harrington's deposition testimony that employees of UMG Recordings, Inc. (the entity referred to herein as UMG) commonly refer to their employer as "Universal Music Group" does not create a genuine issue of fact to the contrary. Harrington Dep. 5–6; *see* Bart Supp. Decl. Ex. 12 ¶¶ 8–9 (describing "Universal Music Group" as a trade name that does not refer to a specific legal entity). Absent some evidence that Universal Music Group, Inc. was a signatory to the Agreement or was in fact the alter ego of UMG, summary judgment must be granted in its favor.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted, and plaintiff's motion for summary judgment is denied. The Clerk of Court is directed to enter judgment in defendants' favor, to terminate the motion pending at docket number 76, and to close this case.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: April 19, 2013
       New York, New York